**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| The People of La Junta for Preservation; Far Flung Outdoor Center; Andrew Austin; and Christina Hernandez,<br><br>*Plaintiffs*,<br><br>v.<br><br>Department of Homeland Security; Markwayne Mullin, in his official capacity as the Secretary of the United States Department of Homeland Security; Customs and Border Protection; Rodney S. Scott, in his official capacity as the Commissioner of United States Customs and Border Protection; Lloyd M. Easterling, in his official capacity as the Chief Patrol Agent of the United States Border Patrol's Big Bend Sector; Department of the Interior; Doug Burgum, in his official capacity as the Secretary of the Interior; and National Park Service,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 26-5245 |

---

**Plaintiffs' Original Complaint for Declaratory and Injunctive Relief**

---

**INTRODUCTION**

1. More than a century ago, President Theodore Roosevelt helped establish a principle that became part of the Nation's civic inheritance: some places are of such extraordinary natural, historic, and scientific value that they should be preserved from ordinary exploitation and held in trust for generations yet to come. During his presidency, Roosevelt made conservation of the Nation's natural resources a central federal responsibility and protected vast areas of public land from irreversible destruction.

2. Congress carried that tradition forward when it created Big Bend National Park. In 1935, Congress authorized the establishment of a national park in the Big Bend region of Texas and directed that the lands acquired there be "established, dedicated, and set apart as a public park for the benefit and enjoyment of the people." 16 U.S.C. § 156. Texas thereafter assembled and conveyed approximately 700,000 acres to the United States, and Big Bend National Park was formally established in 1944.

3. Congress did more than create a boundary on a map. It made an express statutory judgment about who would protect and develop this particular place. Congress directed that the "administration, protection, and development" of Big Bend National Park be exercised under the direction of the Secretary of the Interior through the National Park Service. 16 U.S.C. § 158.

4. Big Bend is precisely the kind of place Congress intended that command to protect. Its desert, river, and mountain ecosystems support extraordinary biological diversity, including more than 1,200 plant species, more than 450 bird species, and dozens of species of mammals, reptiles, amphibians, and fish. Its exposed geology preserves roughly 130 million years of natural history. Its landscape also contains the physical record of thousands of years of human

occupation, including sites associated with Indigenous peoples who lived, traveled, hunted, and worshiped throughout the Big Bend region.

5. The federal government now proposes to excavate, grade, and construct permanent border infrastructure through this protected landscape. The Department of Homeland Security has announced plans encompassing barriers, patrol roads, earthwork, excavation, fill, site preparation, drainage structures, lighting, cameras, sensors, and related infrastructure within the Big Bend Sector. In attempting to clear the legal path for that construction, the Secretary of Homeland Security invoked § 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act and purported to waive dozens of federal and state legal requirements, including several statutes specifically governing Big Bend National Park.

6. But Congress did not give the Secretary of Homeland Security authority to erase every law bearing upon Big Bend merely by publishing a notice in the *Federal Register*. Section 102(c) permits waiver only within the authority Congress actually conferred, and the Secretary's June 9, 2026 determination does not waive every federal command applicable to the Park. Among other things, the Secretary expressly waived 16 U.S.C. §§ 156, 157, 157c, and 157d, yet did not waive § 158—the provision by which Congress specifically assigned the administration, protection, and development of Big Bend National Park to the Department of the Interior and the National Park Service.

**7.** This case therefore does not ask the Court to decide whether border security is important, nor does it ask the Court to substitute its policy judgment for that of the Executive Branch. It asks a much narrower and more fundamental question: whether an Executive agency may undertake permanent development inside a congressionally protected national park when

Congress assigned that authority elsewhere, and when the Secretary has not lawfully displaced the statutory command that governs that Park.

8. The answer is no. The Executive may exercise the authority Congress granted it. It may not manufacture authority Congress withheld.

**PARTIES**

9. Plaintiff Far Flung Outdoor Center is a Texas business located at 23310 FM 170, Terlingua, Texas 79852. Far Flung provides lodging, guided river trips, outdoor recreation, and related services to visitors traveling to the Big Bend region and the Rio Grande. Far Flung's business depends directly upon continued public access to, enjoyment of, and visitation to the natural and recreational resources of the Big Bend region, including Big Bend National Park and the Rio Grande corridor.

10. In the most recent year, Far Flung generated approximately $2.7 million in gross business revenue. A substantial portion of that business is derived from visitors who travel to the region specifically to experience the river, the Park, and the surrounding landscape. Construction of permanent border barriers, patrol roads, staging areas, lighting, earthworks, and related infrastructure in and around Big Bend will impair the visitor experience, disrupt access, diminish the scenic and recreational character of the area, and reduce demand for the services Far Flung provides.

11. Far Flung therefore faces concrete and imminent economic injury from the challenged project, including lost bookings, reduced demand for guided river and outdoor activities, diminished lodging revenue, and disruption of the natural resources upon which its business

depends. Those injuries are fairly traceable to Defendants' construction activities and would be prevented or reduced by declaratory and injunctive relief restraining unlawful construction.

12. Plaintiff The People of La Junta for Preservation is a nonprofit organization associated with members of the Lipan Apache community and dedicated to the preservation of the cultural, historical, archaeological, and natural heritage of the La Junta and greater Big Bend region. The organization works to protect places, artifacts, landscapes, and traditions associated with Native peoples who have lived, traveled, hunted, gathered, worshiped, and maintained cultural relationships throughout the region for generations.

13. People of La Junta for Preservation and its members have direct interests in lands and cultural resources threatened by Defendants' proposed excavation and construction activities. The challenged project threatens archaeological resources, ancestral landscapes, traditional-use areas, and places of cultural and potentially religious significance to members of the organization.

14. Destruction or physical alteration of such sites cannot be remedied by monetary damages. Once an archaeological site is excavated by heavy machinery, once the physical context of artifacts is destroyed, or once a sacred or culturally significant landscape is permanently altered, the injury is irreparable. People of La Junta for Preservation seeks prospective relief to prevent those injuries before they occur.

15. Plaintiff Christina Hernandez is the founder and director of People of La Junta for Preservation. Hernandez has a personal, continuing relationship with the cultural and historical resources of the La Junta and Big Bend region and has devoted substantial time and effort to their study, preservation, and protection.

16. Hernandez personally visits, studies, documents, and seeks to preserve sites and landscapes in the Big Bend region associated with Native history and culture. She intends to continue those activities in the future. The challenged construction threatens to damage or permanently alter places and resources that Hernandez personally uses, studies, and values, thereby causing her concrete aesthetic, cultural, historical, and recreational injury.

17. To the extent the threatened areas include places used by Hernandez or members of her community for religious observance, ceremony, prayer, gathering, or other traditional religious practices, the challenged construction also threatens to substantially burden the exercise of religion by physically altering, restricting access to, or destroying the places at which those practices occur.

18. Andrew Austin is a resident of Brackettville, Texas, and a practitioner of Native religion. Austin regularly travels to the Big Bend region for religious purposes. Approximately three times each year, he participates in religious observances in Big Bend that include prayer and traditional singing. Those practices are undertaken in and in relationship with the Big Bend landscape and are part of his continuing religious exercise. His lineage is Lipan Apache.

19. Austin intends to return to Big Bend and continue those religious practices. The challenged construction—including physical barriers, roads, access restrictions, excavation, surveillance infrastructure, lighting, and associated activity—threatens to interfere with his ability to engage in prayer, singing, and related religious observance under the conditions and at the locations in which he practices.

20. Each Plaintiff faces concrete and particularized injury from the challenged construction. Far Flung faces economic and recreational injury to its Big Bend-based business. PLJP and its members face injury to cultural, archaeological, traditional-use, and religious resources they use

and seek to preserve. Hernandez and Austin face personal injury to their continuing use of the affected landscape, including religious exercise. Those injuries are traceable to the challenged construction and redressable by declaratory and injunctive relief.

21. Defendant United States Department of Homeland Security ("DHS") is an executive department of the United States responsible for, among other things, border security and the administration and enforcement of federal immigration and border laws. DHS has invoked § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, as authority for the challenged construction of physical barriers, roads, excavation, grading, lighting, cameras, sensors, and related infrastructure in the Big Bend Sector. DHS is the federal department responsible for the challenged waiver determination and the actions complained of herein.

22. Defendant Markwayne Mullin is the Secretary of the United States Department of Homeland Security. He is sued solely in his official capacity. As Secretary, Mullin exercises authority delegated under § 102 of IIRIRA and is responsible for the June 9, 2026 determination purporting to waive numerous federal, state, and other legal requirements in connection with border-barrier and road construction in the Big Bend Sector. Mullin possesses authority to direct, suspend, modify, or terminate the challenged DHS actions and is therefore an appropriate defendant for prospective declaratory and injunctive relief.

23. Defendant United States Customs and Border Protection ("CBP") is a component agency of DHS charged with securing the Nation's borders and administering border-enforcement operations. Through the United States Border Patrol and its Big Bend Sector, CBP is responsible for border-enforcement operations throughout the affected region and is participating in the

planning, authorization, implementation, and construction of the challenged border infrastructure.

24. Defendant Rodney S. Scott is the Commissioner of United States Customs and Border Protection. He is sued solely in his official capacity. As Commissioner, Scott is the senior official responsible for the operations of CBP, including the border-security activities challenged in this action. Scott has authority over CBP's implementation of border-barrier and associated infrastructure projects and is an appropriate defendant for prospective declaratory and injunctive relief.

25. Defendant Lloyd M. Easterling is the Chief Patrol Agent of the United States Border Patrol's Big Bend Sector and is sued solely in his official capacity. Easterling is the senior Border Patrol official responsible for operations within the Big Bend Sector and exercises operational authority over Border Patrol activities within the geographic area in which the challenged project is being undertaken. He is an appropriate defendant because officers, employees, contractors, and agents operating under CBP and Border Patrol authority within the Big Bend Sector are implementing or facilitating the challenged construction.

26. Defendant United States Department of the Interior ("Interior") is an executive department of the United States charged with administration of the National Park Service and the lands comprising the National Park System. Congress specifically directed that the "administration, protection, and development" of Big Bend National Park be exercised under the direction of the Secretary of the Interior through the National Park Service. 16 U.S.C. § 158.

27. Defendant Doug Burgum is the Secretary of the Interior and is sued solely in his official capacity. As Secretary, Burgum exercises supervisory authority over the National Park Service and over the administration of Big Bend National Park. Congress expressly assigned to the

Secretary of the Interior, acting through the National Park Service, responsibility for the "administration, protection, and development" of Big Bend National Park. 16 U.S.C. § 158. Burgum therefore possesses authority and responsibility concerning whether, and under what lawful authority, DHS and CBP may undertake permanent development within Big Bend National Park.

28. Defendant National Park Service ("NPS") is a bureau of the Department of the Interior charged with management and protection of the National Park System. NPS is the federal agency Congress specifically designated to administer, protect, and develop Big Bend National Park. NPS possesses management authority over lands and resources within Big Bend National Park.

**VENUE & JURISDICTION**

29. This action arises under the Constitution and laws of the United States, including 16 U.S.C. § 158, the Religious Freedom Restoration Act, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, and the United States Constitution. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and laws of the United States.

30. This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and possesses traditional equitable authority to restrain federal officers and agencies from acting beyond the authority conferred upon them by Congress.

31. To the extent applicable, sovereign immunity is waived pursuant to 5 U.S.C. § 702 because Plaintiffs seek relief other than money damages against federal agencies and officers alleged to be acting unlawfully or beyond their statutory authority.

32. To the extent Plaintiffs seek relief compelling a federal officer to perform a clear, nondiscretionary duty imposed by federal law, this Court additionally possesses jurisdiction pursuant to 28 U.S.C. § 1361.

33. Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred or will occur within this District and a substantial part of the property that is the subject of this action is situated within this District. Plaintiffs properly bring this action in the San Antonio Division of the Western District of Texas**.**

**FACTS**

**A. Big Bend: A Landscape Set Apart by Congress**

34. The Big Bend region has been inhabited, traveled, hunted, traded through, and used by Native peoples for centuries. The landscape surrounding the Rio Grande reflects successive generations of Indigenous, Spanish, Mexican, and American occupation and contains archaeological, cultural, and historic resources associated with that history. The National Park Service recognizes that Native peoples occupied and traveled through the region long before establishment of the modern international boundary.

35. By the early twentieth century, Texans increasingly recognized that the canyons, desert, mountains, wildlife, geology, and cultural resources of Big Bend warranted permanent preservation. Texas created Texas Canyons State Park in 1933, later renamed Big Bend State Park, and began assembling additional lands. Congress followed on June 20, 1935, authorizing establishment of Big Bend National Park and directing that the lands acquired for it be

"established, dedicated, and set apart as a public park for the benefit and enjoyment of the people."

36. Texas thereafter acquired hundreds of thousands of acres necessary to create the Park. In 1942, the State appropriated approximately $1.5 million for that purpose and ultimately conveyed approximately 700,000 acres to the United States. Big Bend National Park was formally established in June 1944.

37. Big Bend was therefore not merely land retained by the federal government from the public domain. Texas and Congress affirmatively assembled, transferred, and set apart this particular landscape for national-park purposes.

**B. Big Bend Is an Irreplaceable Natural, Cultural, and Scientific Landscape**

38. Big Bend National Park protects more than 800,000 acres at the intersection of the Chihuahuan Desert, the Chisos Mountains, and the Rio Grande. Its dramatic elevation changes support an unusual concentration of desert, riparian, mountain, and woodland habitats within a single protected landscape.

39. The Rio Grande is inseparable from the character of Big Bend. The river forms the Park's southern boundary for approximately 118 miles, passes through Santa Elena, Mariscal, and Boquillas Canyons, and supports natural, cultural, and recreational resources that the National Park Service identifies as central features of the Park.

40. Big Bend's recreational and scenic character depends in substantial part upon its remoteness and lack of development. Visitors travel the Rio Grande by raft, canoe, and kayak through remote canyon country, while sparse development and artificial lighting have preserved

exceptionally dark night skies. Roads, barriers, lighting, towers, vehicle traffic, and related infrastructure threaten those qualities even where physical access remains technically available.

41. Many of Big Bend's resources derive their significance from their location and undisturbed context. Archaeological materials cannot be restored to their original context after excavation; naturally dark desert cannot remain naturally dark after permanent illumination; and an uninterrupted river or canyon landscape cannot remain unchanged after roads, barriers, grading, and other permanent development. Once those conditions are materially altered, a later judgment cannot fully recreate the landscape Congress set aside.

### C. Congress Authorized Border Barriers and Conferred Limited Waiver Authority

42. Congress has authorized the Secretary of Homeland Security to construct additional physical barriers and roads near the international border to deter unlawful crossings in areas of high illegal entry. Section 102 also authorizes related border infrastructure, including roads, lighting, cameras, and sensors.

43. Congress separately authorized the Secretary, in the Secretary's discretion, to waive legal requirements determined necessary to ensure the expeditious construction of barriers and roads undertaken pursuant to § 102.

44. Those provisions perform different functions. Sections 102(a) and (b) identify the construction DHS may undertake; § 102(c) permits the Secretary to waive otherwise applicable legal requirements in connection with that authorized construction.

45. Accordingly, the Secretary's exercise of waiver authority does not itself expand the substantive construction authority Congress conferred or resolve the continued operation of federal statutes that the Secretary did not waive.

**D. DHS Targets the Big Bend Sector**

46. The United States Border Patrol divides the Southwest border into geographic sectors for operational purposes. The Big Bend Sector encompasses an exceptionally large area of West Texas and is responsible for more than 500 miles of the Rio Grande, nearly one-quarter of the entire Southwest border. CBP describes the Sector as the largest geographic area of responsibility of any Border Patrol sector along the Southwest border.

47. In 2026, the Department of Homeland Security determined that additional physical barriers and roads should be constructed within the Big Bend Sector pursuant to § 102 of IIRIRA. DHS characterized the Big Bend Sector as an "area of high illegal entry" and relied principally upon Border Patrol enforcement statistics from fiscal years 2021 through 2025. According to the Secretary's determination, Border Patrol apprehended more than 89,000 persons attempting unlawful entry within the Sector during that five-year period and seized substantial quantities of marijuana, cocaine, methamphetamine, heroin, and fentanyl.

48. Those statistics concern the Big Bend Sector as a whole, an operational area extending across hundreds of miles of international boundary and a vast portion of West Texas. DHS nevertheless relied upon those sector-wide statistics in determining that a particular segment of the border was itself an area of high illegal entry warranting immediate construction of additional barriers and roads.

49. DHS stated that, notwithstanding recent reductions in unlawful crossings, "more can and must be done" to achieve operational control of the border. The Secretary therefore determined that DHS would take "immediate action" to construct additional barriers and roads within a geographically defined portion of the Big Bend Sector.

50. The Secretary defined the relevant “project area” as beginning at approximately 29.325866, -104.046466 and extending eastward to approximately 29.728522, -102.683945. DHS declared that this corridor constituted an area of high illegal entry and that there existed an “acute and immediate need” for additional physical barriers and roads within it.

51. DHS’s proposed project is not limited to the placement of a discrete fence or barrier. The Secretary’s own determination describes construction broadly to include access to project areas, creation and use of staging areas, earthwork, excavation, placement of fill, site preparation, construction and upkeep of physical barriers and roads, supporting elements, drainage structures, erosion controls, safety features, lighting, cameras, and sensors.

52. The Department’s decision is particularly striking in light of recent enforcement data. CBP reported that illegal border crossings in the Big Bend Sector declined significantly during fiscal year 2025. Publicly reported monthly apprehensions during that period fell into the low hundreds, including 156 apprehensions in June 2025, 142 in July, and 208 in August.

53. DHS nevertheless based the June 2026 determination principally upon cumulative enforcement statistics reaching back to fiscal year 2021 and concluded that immediate physical construction was required within the identified project area.

54. That distinction is material because § 102(a) directs construction of additional barriers and roads to deter illegal crossings in “areas of high illegal entry.” The Big Bend Sector encompasses hundreds of miles of river boundary and vastly more territory than the particular corridor selected for construction. Whether conditions throughout the Sector establish the statutory predicate for construction at each location within the project area presents a question distinct from the Secretary’s separate authority to waive legal requirements once lawful construction is otherwise authorized.

55. Moreover, the June 9, 2026 determination was itself a republication of an earlier May 15, 2026 waiver. DHS stated that the May determination had described the project area incorrectly and therefore republished the waiver with a corrected geographic description.

56. The correction is significant because § 102(c) waivers operate with respect to defined construction activities within a defined project area. Activities undertaken outside the geographic scope of a valid waiver remain subject to otherwise applicable law. To the extent DHS, CBP, their contractors, or other agents undertook surveying, access, staging, excavation, construction, or other ground-disturbing activity before June 9, 2026 in areas not encompassed by the May 15 description, those activities were not rendered lawful merely by the Secretary's subsequent republication of the waiver.

### E. The Project Corridor Traverses a Continuous Landscape of State and Federal Conservation Lands

57. The geographic limits selected by the Secretary place the challenged project in an extraordinary location. The June 9 determination defines the project area as beginning at approximately 29.325866, -104.046466 and extending east along the international border to approximately 29.728522, -102.683945. The project is therefore not a generalized authorization for construction somewhere within the hundreds of miles comprising the Big Bend Sector. It identifies a particular Rio Grande corridor extending across the protected Big Bend landscape.

58. The western endpoint of the June 9 project area lies within the geographic boundaries depicted by the Texas Parks and Wildlife Department for Big Bend Ranch State Park. Big Bend Ranch State Park extends along the Rio Grande between the Presidio area and Lajitas and encompasses more than 300,000 acres of protected Chihuahuan Desert landscape. TPWD

identifies Fort Leaton, southeast of Presidio, as the Park's western entrance and the Barton Warnock Visitor Center, immediately east of Lajitas, as its eastern entrance.

59. Thus, unlike an ordinary border project beginning on privately held ranchland or previously developed federal property, the June 9 project begins in a landscape that the State of Texas itself acquired and maintains for conservation, recreation, cultural-resource protection, and public use. The Rio Grande forms a substantial portion of the southern boundary of Big Bend Ranch State Park, placing the very river corridor identified by DHS within the State's protected landscape.

60. Traveling eastward, the project area reaches the western portion of Big Bend National Park. The Rio Grande then forms the southern boundary of Big Bend National Park for approximately 118 river miles. Along that course the river passes through or beside some of the Park's defining landscapes, including Santa Elena Canyon, the Castolon district, Mariscal Canyon, the Rio Grande Village area, and Boquillas Canyon.

61. The federal protection of the river corridor does not terminate with the eastern boundary of Big Bend National Park. Congress separately designated a long downstream portion of the Rio Grande as the Rio Grande Wild and Scenic River. The National Park Service administers approximately 196 miles of that designated river, including approximately 69 miles within Big Bend National Park and approximately 127 miles downstream from the Park boundary.

62. East of Big Bend National Park, the protected landscape also includes Black Gap Wildlife Management Area, property managed by the Texas Parks and Wildlife Department. Black Gap contains approximately 103,000 acres, borders Big Bend National Park, and shares approximately twenty-five miles of boundary with the Rio Grande. TPWD expressly recognizes

that the Rio Grande adjoining Black Gap lies within the federally designated Wild and Scenic River corridor.

63. Accordingly, the June 9 project area is geographically remarkable. Beginning within Big Bend Ranch State Park, it proceeds eastward through the broader protected Big Bend landscape, along the international river boundary associated with Big Bend National Park, the Rio Grande Wild and Scenic River, and state-managed conservation lands including Black Gap Wildlife Management Area. The precise ownership and administrative status of every parcel within the construction footprint must ultimately be determined from DHS's alignment, surveys, easements, rights of entry, and construction plans, but the Secretary selected a corridor dominated by lands that governments have affirmatively set aside for conservation and public protection.

64. This geography also divides the project among different governmental custodians. On state park and wildlife-management lands, the State of Texas, acting principally through the Texas Parks and Wildlife Department, possesses property and management interests. Within Big Bend National Park, Congress assigned the Park's administration, protection, and development to the Secretary of the Interior acting through the National Park Service. Along the designated Rio Grande Wild and Scenic River, the National Park Service exercises the federal administrative responsibilities Congress assigned to it, although the extent of federal property ownership differs downstream from the National Park boundary.

65. DHS's June 9 determination does not explain how the Department obtained the property interest, right of entry, easement, administrative permission, or other authority necessary to construct upon each portion of this protected corridor. The determination identifies the geographic project area and waives numerous legal requirements, but it does not itself convey

title, grant an easement, transfer administrative jurisdiction, or identify any agreement by which Texas or the Department of the Interior authorized DHS to occupy the affected lands.

66. The geographic character of the project therefore presents legal questions independent of the Secretary's waiver of environmental-review statutes. A waiver of regulatory requirements does not, standing alone, establish who owns the land, who administers it, whether another governmental entity has consented to its occupation, or what independent statutory authority permits DHS to undertake permanent development upon lands otherwise committed to state-park, national-park, wildlife-management, or Wild and Scenic River purposes.

### F. The Secretary Waives Laws Protecting Big Bend

67. To expedite construction within the Big Bend project area, the Secretary of Homeland Security invoked the extraordinary waiver authority provided by § 102(c) of IIRIRA. In the June 9, 2026 determination, the Secretary stated that there was an "acute and immediate need" for additional physical barriers and roads and concluded that waiver of otherwise applicable legal requirements was necessary to ensure their expeditious construction.

68. The Secretary then purported to waive, in their entirety as applied to the project, an extensive collection of federal, state, and other legal requirements. The waived statutes include many of the Nation's principal laws protecting environmental, historic, archaeological, cultural, and natural resources, including the National Environmental Policy Act, the Endangered Species Act, the Clean Water Act, the National Historic Preservation Act, the Archaeological Resources Protection Act, and related statutory requirements.

69. The waiver is particularly consequential in Big Bend because the Secretary did not limit it to generally applicable environmental statutes. DHS also expressly waived statutes specifically

directed to the establishment, boundaries, acquisition, and protection of Big Bend National Park. Among those expressly waived are 16 U.S.C. §§ 156, 157, 157c, and 157d.

70. Section 156 is the provision by which Congress directed that lands acquired for Big Bend be "established, dedicated, and set apart as a public park for the benefit and enjoyment of the people." 16 U.S.C. § 156. Section 157 governs the federal acquisition of the lands comprising the original Park.

71. But the Secretary did not waive every provision of that framework. The Big Bend-specific subchapter of Title 16 separately contains § 158, entitled "Administration, protection, and development." Section 158 is the provision by which Congress assigned those functions to the Secretary of the Interior acting through the National Park Service. The United States Code continues to list § 158 separately from the acquisition and boundary provisions that DHS expressly waived.

72. Section 158 is not identified among the Big Bend-specific statutes expressly waived in the June 9 determination. Nor does the determination state that the Secretary is displacing Congress's assignment of the administration, protection, and development of Big Bend National Park to the Department of the Interior and the National Park Service. That omission is especially notable because DHS demonstrated that it knew how to identify and waive Big Bend-specific statutes individually. The Secretary expressly named §§ 156, 157, 157c, and 157d, while leaving § 158 unmentioned.

73. The distinction is substantive. The waived provisions principally concern the Park's establishment, acquisition, and boundaries. Section 158, by contrast, governs the continuing exercise of governmental authority over the Park's administration, protection, and development.

74. The June 9 determination does not explain how DHS intends to reconcile its proposed construction with § 158. It does not identify any transfer of the authority Congress assigned to Interior and the National Park Service, any separate congressional authorization displacing § 158, or any determination expressly waiving that statute.

75. The breadth of the waiver makes the threatened physical consequences particularly acute. Ordinary statutory mechanisms requiring environmental review, historic-preservation consultation, archaeological investigation, and protection of sensitive natural and cultural resources have been removed from the project. Construction is therefore positioned to proceed rapidly in a landscape where substantial archaeological and natural resources remain undocumented and where physical disturbance may cause permanent injury before judicial review can occur.

76. The Secretary also did not waive the American Indian Religious Freedom Act, 42 U.S.C. § 1996, or the Religious Freedom Restoration Act. AIRFA declares the policy of the United States to protect and preserve Native Americans' exercise of traditional religions, including access to sites, use and possession of sacred objects, and worship through ceremonials and traditional rites. Those provisions remain part of the federal statutory landscape governing Defendants' conduct.

### G. The Challenged Project Will Physically Transform the Big Bend Landscape

77. The challenged project has moved beyond a general policy proposal. CBP has awarded Fisher Sand & Gravel Co. a contract for the "Big Bend 2 Wall Project," calling for construction of approximately 62 miles of primary border wall system.

78. The contemplated work extends well beyond placement of a vertical barrier. DHS expressly describes the project as including access to project areas, staging areas, earthwork, excavation, fill, site preparation, physical barriers and roads, supporting elements, drainage and erosion controls, safety features, lighting, cameras, and sensors.

79. Those activities require substantial physical occupation and alteration of the land. Construction will require workers and heavy equipment to reach the corridor, materials to be transported and staged, ground to be cleared and prepared, foundations and supporting structures to be installed, and roads to be constructed or improved for construction, patrol, inspection, repair, and maintenance.

80. The resulting footprint therefore extends beyond the wall itself. Roads, access routes, staging areas, excavation, drainage structures, erosion controls, lighting, and surveillance equipment will create additional areas of permanent or recurring disturbance throughout the construction corridor.

81. Those effects are especially consequential in Big Bend. The affected landscape contains biological habitat, river corridors, geological and paleontological resources, archaeological sites, Native cultural landscapes, and exceptionally dark night skies whose value depends substantially upon their undisturbed location, context, and relationship to the surrounding landscape.

82. Excavation and grading may permanently destroy archaeological and geological context, while roads and barriers may fragment habitat and alter movement through the landscape. Artificial lighting and surveillance infrastructure may alter areas even where the underlying ground remains physically intact.

83. The challenged action is therefore not merely the installation of border infrastructure. It is an extensive land-development project involving excavation, roads, structures, drainage

facilities, lighting, surveillance equipment, and continuing maintenance. Within Big Bend National Park, those activities constitute physical "development" of lands for which Congress provided that the "administration, protection, and development" shall be exercised under the direction of the Secretary of the Interior through the National Park Service. 16 U.S.C. § 158.

### H. The Project Threatens the Rio Grande, Scenic Landscape, and Recreational Use of Big Bend

84. The Rio Grande is not merely the southern boundary of Big Bend National Park. It is one of the Park's defining natural and recreational resources. The river cuts through Santa Elena, Mariscal, and Boquillas Canyons and provides visitors with access to portions of the Park that are experienced most directly from the water. The National Park Service specifically promotes river travel as a principal means of experiencing Big Bend, including half-day floats and multi-day trips through remote canyon country.

85. The recreational experience offered by the Rio Grande depends heavily upon the character of the surrounding landscape. Visitors float through remote desert and canyon environments precisely because they remain largely undeveloped, visually expansive, and isolated from ordinary urban infrastructure. The National Park Service identifies scenic vistas, outdoor adventure, dark skies, historic sites, wildlife, and border culture among the principal experiences that draw visitors to Big Bend.

86. The challenged project threatens to alter those conditions. DHS contemplates barriers, patrol roads, access routes, staging areas, excavation, fill, lighting, cameras, sensors, and related supporting infrastructure along the Rio Grande corridor. Where such infrastructure is visible from the river, adjacent trails, overlooks, roads, campsites, or other recreational areas, it will

introduce permanent industrial and security infrastructure into landscapes presently valued for their remoteness and absence of comparable development.

87. The injury is not limited to obstruction of a particular trail or river access point. Scenic and recreational injury may occur even where visitors remain physically capable of entering an area. The experience of floating an undeveloped canyon, viewing an uninterrupted desert horizon, traveling through a naturally dark river corridor, or encountering a landscape substantially free from permanent infrastructure is materially different from experiencing the same location alongside walls, patrol roads, construction equipment, artificial lighting, surveillance towers, and regular maintenance traffic.

88. Those threatened changes directly affect Plaintiff Far Flung Outdoor Center. Far Flung has operated in the Big Bend region for decades and presently offers lodging, guided river trips, Jeep tours, ATV excursions, shuttles, and related outdoor recreational services. Far Flung specifically markets river trips through the Big Bend landscape, including guided excursions on the Rio Grande, and promotes the region's canyons, mountains, desert, scenery, and wilderness character as central features of the experiences it sells.

89. These harms cannot be eliminated merely by leaving formal access technically open. Continued permission to stand beside a wall, travel next to a newly graded patrol road, or view an illuminated construction corridor does not preserve the recreational, aesthetic, and cultural experience that existed before the development occurred.

90. Accordingly, the threatened harm to recreational use is inseparable from the threatened physical alteration of the resource itself. Where the resource being enjoyed is an undeveloped river corridor, naturally dark desert, historic landscape, or uninterrupted canyon view, alteration of that landscape constitutes alteration of the recreational experience.

## I. The Project Threatens Archaeological and Indigenous Cultural Resources

91. Big Bend National Park preserves an archaeological record of human occupation extending back at least 10,000 years. The National Park Service recognizes thousands of archaeological sites within the Park containing material evidence of Native occupation, subsistence, travel, settlement, trade, and adaptation to the desert environment. That record is not confined to a handful of known monuments or excavated sites. Much of Big Bend's archaeological landscape remains incompletely surveyed and undocumented. The Park Service has undertaken substantial archaeological work over time, but the scale of the Park and the density of cultural resources mean that unknown sites and artifacts remain throughout the landscape. A long-term archaeological sampling project surveyed more than 60,000 acres and recorded more than 1,500 archaeological sites, including previously undocumented sites, features, and artifacts.

92. The archaeological significance of Big Bend is inseparable from the physical context in which cultural materials are found. The National Park Service explains that the relationship between an artifact and its location is critical to determining the human activity represented at a site. An artifact's position, association with surrounding objects and features, and relationship to the landscape are themselves archaeological evidence. Ground disturbance therefore can destroy archaeological information even where an artifact itself survives. Excavation, grading, trenching, road construction, placement of fill, and the movement of heavy equipment may separate cultural materials from their original context, destroy associated features, alter stratigraphy, or obliterate an archaeological site before its significance is known. Such information cannot be recreated after the earth has been removed or rearranged.

93. Big Bend's archaeological resources also represent more than scientific objects. They are the physical remains of generations of people who lived in, traveled through, and maintained relationships with the Big Bend landscape long before creation of the international boundary or establishment of the National Park. NPS describes the region as having been home to people for centuries and documents the presence and movement of numerous Indigenous groups through the area.

94. The broader cultural geography of the region is also connected to La Junta de los Ríos, the historic confluence of the Rio Grande and Río Conchos west of Big Bend National Park. NPS historical materials describe La Junta as an important locus of permanent Indigenous communities and agriculture within the greater Big Bend region.

95. The threatened construction presents an especially acute danger because DHS has authorized precisely the kinds of activities capable of disturbing such resources: excavation, earthwork, placement of fill, site preparation, new and improved roads, staging areas, drainage improvements, barriers, lighting, and supporting infrastructure. Those activities will occur within a region in which the full extent and location of archaeological resources remain unknown.

96. Under ordinary circumstances, federal historic-preservation and archaeological laws provide mechanisms through which cultural resources may be identified, studied, consulted upon, avoided, or protected before federal construction proceeds. But the Secretary has purported to waive many of those protections for the challenged project, including the National Historic Preservation Act, the Archaeological Resources Protection Act, and other statutes directed to archaeological and cultural resources. As a result, the ordinary statutory processes designed to identify threatened resources before physical disturbance may not occur before DHS moves heavy equipment into the affected landscape. Where the location of many archaeological

resources remains unknown, elimination of preconstruction review substantially increases the risk that destruction will precede discovery.

97. Plaintiff People of La Junta for Preservation exists to preserve the cultural, historical, archaeological, and natural heritage of the La Junta and greater Big Bend region. Its work includes the preservation and protection of places and cultural resources associated with Native peoples of the region, including the Lipan Apache community. Members of the organization have personal and continuing interests in the survival of those resources and in their transmission to future generations. Plaintiff Christina Hernandez, founder and director of People of La Junta for Preservation, has personally devoted substantial time and effort to the identification, study, preservation, interpretation, and protection of Native cultural resources and landscapes within the greater Big Bend and La Junta region. Hernandez intends to continue that work and to continue visiting and using places threatened by the challenged project.

98. For Hernandez and members of People of La Junta for Preservation, destruction of a Native cultural site is not remedied merely because an artifact may later be collected and placed in federal custody. The injury includes the loss of the place itself, the relationship among cultural materials and the surrounding landscape, and the ability of living people to encounter, study, preserve, teach about, and maintain relationships with places connected to their history and traditions. Nor can those resources simply be replaced elsewhere. A newly designated tract of federal land cannot substitute for an ancestral site located where generations actually lived or traveled. An artifact placed in a repository cannot restore the context destroyed by a bulldozer. And a photograph of an intact cultural landscape cannot restore that landscape after it has been cut by roads, excavation, permanent structures, or other development.

99. Plaintiffs therefore face a concrete and irreparable cultural and archaeological injury if construction proceeds before the legality of Defendants' actions can be adjudicated. Once a site is destroyed or its archaeological context removed, no subsequent judicial order can return it to its undisturbed condition.

**J. The Project Threatens the Religious Exercise and Living Cultural Practices of Christina Hernandez, Andrew Austin, and Members of People of La Junta**

100. The Indigenous significance of the Rio Grande and the greater Big Bend and La Junta landscape is not confined to archaeology, historic preservation, or events occurring in the distant past. Plaintiff Christina Hernandez and other Indigenous practitioners maintain living religious relationships with the River, ancestral lands, burial places, plants, caves, rock shelters, natural materials, and other places within that landscape.

101. Hernandez is a direct lineal descendant of Aboriginal People of La Junta and Lipan Apache families of the Barrio de los Lipanes in Presidio, Texas. She has been honored as an Eagle Staff Bearer by the Kolkahéndé (Prairie Grass) clan of the Lipan Apache Tribe of Texas, as well as by Jumano Apache, Chiso, and Concho Elders of La Junta de Los Rios. She is the founder of Plaintiff People of La Junta for Preservation and participates personally in the preservation and care of ancestral lands and burial places. Hernandez is also an enrolled member of the Lipan Apache.

102. Hernandez's relationship to the Rio Grande is religious as well as ancestral and cultural. According to the teachings she received from family elders and continues to practice, the River is living and is a relative. The Rio Grande is therefore not merely water, an international boundary, or the physical setting surrounding religiously significant places. The

River itself forms part of an interconnected religious relationship among living people, ancestors, plants, animals, earth, springs, tributaries, caves, mountains, and the night sky.

103. Hernandez and members of her community continue to practice that religion today. They pray beside the Rio Grande; gather River water for ceremonial use; harvest cattail pollen and other natural materials from the River landscape; visit and care for ancestral resting places; travel to sacred places; and teach younger generations their responsibilities toward the River, their ancestors, and the surrounding landscape.

104. Water gathered directly from the Rio Grande is used in coming-of-age ceremonies, funerals and practices surrounding death, prayers, blessings, and the opening of gatherings and events. In those practices, the water is not ornamental. Its religious significance derives from its origin in this particular River and from the relationship among the River, the ancestral landscape, the practitioner, the ancestors, and the ceremony. For that reason, bottled water, tap water, water obtained from an unrelated source, or even water transported to a different location is not necessarily a religiously equivalent substitute. The particular source and place are components of the religious exercise itself.

105. The same is true of cattail pollen. Hernandez and other practitioners harvest pollen from cattails growing along the Rio Grande for ceremonial use. The religious practice includes approaching the plants, gathering with prayer and intention, taking what is appropriate, and carrying what has been gathered from the River landscape into ceremony. The exercise therefore cannot be reduced to possession of a quantity of pollen. Commercially purchased pollen or pollen gathered at an unrelated location does not necessarily carry the same religious significance because the act of gathering and the relationship among the plant, the River, the place, and the practitioner are themselves parts of the practice.

106. Natural materials gathered from the River landscape also form part of funerary and burial practices. River water, pollen, plants, earth, and prayer connect the deceased to the land, the River, the ancestors, and continuing generations.

107. Within Hernandez's religious understanding, ancestors remain relatives after death. Religious responsibilities toward them include visiting their resting places, praying there, caring for those places, protecting them from disturbance, and teaching younger generations who rests there and what obligations succeeding generations inherit.

108. Accordingly, destruction of an ancestral burial causes an injury different in kind from the loss of an archaeological resource. But physical destruction is not required. A burial place that remains intact but is rendered inaccessible by a wall, patrol road, restricted zone, gate, or enforcement policy may no longer be meaningfully available for the continuing religious practices owed to the ancestor resting there. Caves, rock shelters, springs, rock imagery, gathering places, and other locations throughout the Rio Grande landscape likewise form part of a living sacred geography. Some are places where ancestors lived, prayed, gathered, taught, made imagery, and left objects; some continue to be visited for prayer, reflection, teaching, ceremony, and connection with ancestors.

109. The religious importance of those places cannot necessarily be transferred elsewhere. A cave cannot be relocated. A spring cannot simply be replaced with another spring. An ancestral marking cannot be removed from the place where it was created without changing its relationship to that place. Nor can a burial or a living River necessarily be replaced with a government-selected substitute.

110. Some of these practices are seasonal or otherwise dependent upon circumstances outside governmental control. The appropriate time may depend upon the season, the availability

of a particular plant, the condition of the River, the moon or night sky, traditional teaching, a person's stage of life, or the death of a relative. Cattail pollen, for example, can be harvested only when the plants themselves are producing pollen. Funeral obligations arise when a death occurs. Coming-of-age practices occur when the participant reaches the appropriate stage of life. The infrequency with which a particular place is approached therefore does not establish that the place is not presently used for religious exercise.

111. Meaningful religious access accordingly cannot always be reduced to scheduled visiting hours, predetermined gates, advance governmental permission, or designated access points. The time, place, manner, and route of access may themselves be determined by religious obligation and natural conditions.

112. The natural night sky is also part of Hernandez's religious landscape. Her teachings and religious practices understand the sky, moon, stars, darkness, land, and River as interconnected. Teachings concerning White Changing Woman are particularly important and concern life, transformation, renewal, womanhood, continuity, and relationship with the surrounding world. Natural darkness is therefore more than a recreational or environmental quality. Prayer, teaching, and ceremony take place within a landscape in which transition into darkness, visibility of the moon and stars, and the absence of artificial illumination themselves possess religious significance.

113. Permanent security lighting, floodlights, illuminated patrol roads, construction lights, towers, and related infrastructure would alter that religious environment even where the soil at a particular sacred location remains physically untouched. Artificial illumination extending across the River corridor may impair prayer, ceremony, teaching, and the ability to

transmit teachings concerning the relationship among darkness, sky, River, land, and White Changing Woman.

114. People of La Junta for Preservation provides a concrete example of these continuing practices. PLJP owns and stewards more than 100 acres of Indigenous ancestral lands along the Rio Grande, including substantial River frontage. Portions of those lands have received archaeological and historic designations, but those classifications do not capture their present religious character. The property remains in active religious use. Hernandez and others pray there, gather there, approach the River there, collect River water for religious use, gather plants and ceremonial materials, teach younger generations, honor ancestors, and carry out continuing responsibilities toward the land.

115. Those religious relationships are not confined to PLJP's property boundaries. The sacred geography described by Hernandez includes the Rio Grande itself, riverbanks, springs, tributaries, arroyos, caves, rock shelters, mountains, burial grounds, gathering locations, travel corridors, and places known principally through Indigenous families and communities rather than through governmental inventories. Some sacred locations have intentionally not been publicly identified. Disclosure of caves, burials, imagery, ceremonial places, sacred objects, and gathering areas can expose them to looting, vandalism, collection, disturbance, or desecration. The absence of a site from a federal inventory therefore does not establish the absence of ongoing religious significance.

116. The proposed border infrastructure threatens these practices through more than direct destruction. A wall may leave a cave physically intact while preventing practitioners from reaching it. It may leave a cattail stand undisturbed while preventing access when pollen is available. It may leave a burial physically untouched while separating descendants from the

place where religious obligations must be performed. Likewise, roads, gates, patrol zones, surveillance infrastructure, cameras, lighting, grading, excavation, and recurring enforcement activity may alter the conditions under which prayer, gathering, teaching, burial-related practices, and religious travel occur.

117. Hernandez's religious understanding does not treat the Rio Grande as a collection of unrelated parcels separated by modern property or political boundaries. The River predates the international boundary, and the relationship described by Hernandez extends along a connected River landscape rather than terminating at the edge of a county, municipality, park, private parcel, or Border Patrol sector.

118. The threatened religious injury therefore cannot be measured solely by asking whether a proposed segment of wall physically crosses a recorded archaeological or sacred site. Construction may substantially burden religious exercise by interrupting access, movement, gathering, hydrology, darkness, privacy, or the relationship among multiple sacred places even where the construction footprint avoids a known burial or archaeological deposit.

119. The cumulative threatened burden includes interference with access to ceremonial River water; harvesting cattail pollen and other materials; funerary and burial obligations; coming-of-age ceremonies; prayer; access to graves, caves, imagery, and gathering areas; naturally dark skies; religious teaching concerning White Changing Woman; religious travel among interconnected places; privacy; and transmission of these practices to younger generations.

120. These are present practices. Hernandez and other practitioners continue to gather water from the Rio Grande, use that water ceremonially, harvest cattail pollen, pray beside the

River, visit and protect ancestral resting places, travel to sacred locations, practice and teach beneath the natural night sky, and transmit these obligations to succeeding generations.

121. The proposed project therefore threatens more than historical, archaeological, aesthetic, or cultural interests. It threatens Hernandez's and other practitioners' ability to engage in religious exercise in the places, with the water and natural materials, under the conditions, and at the times their beliefs and practices require.

122. Plaintiff Andrew Austin also practices his chosen religion in the Big Bend region by engaging in religious rites of song and dance in sacred sites, including Big Bend National Park. As a lineal descendant of the Lipan Apache people, Andrew Austin engages in other rites on sacred land, including sweat lodges and burial ceremonies. The sacred places of his religion are the connection to land along the Rio Grande that borders the State and National Park. These places and his religious rites are directly threatened by the proposed project and active construction in the area.

123. Congress itself has recognized these categories of traditional Native religious exercise. AIRFA expressly identifies access to sites, sacred objects, ceremonials, and traditional rites as protected components of Native religious practice.

124. The People of La Junta for Preservation likewise alleges injury through its members. At least one member will suffer an injury sufficient to confer standing in his or her own right; the interests threatened by Defendants' actions are germane to the organization's preservation mission; and the prospective declaratory and injunctive relief sought does not require individualized monetary relief.

125. The threatened construction will also impair Hernandez's, Austin's, and the organization's ability to transmit traditional knowledge. Certain religious and cultural practices

are taught through direct experience of particular landscapes—by taking younger or other community members to places associated with ancestors, explaining the significance of natural features, identifying traditional routes or resources, and practicing traditions in the places to which those traditions are connected.

126. If those places are destroyed or materially transformed, that form of transmission is itself impaired. A photograph, map, museum display, or oral description of a destroyed place does not provide the same experience as encountering and practicing within the place itself.

127. Plaintiffs therefore face injuries distinct from any ideological disagreement with Defendants' border policy. Their claimed injury concerns the ability of living persons to continue concrete practices at identifiable places that Defendants propose physically to alter.

**K. The Threatened Burden Is Concrete and Site-Specific**

128. RFRA protects a "person's exercise of religion" from substantial federal burdens unless the Government satisfies the statute's demanding justification requirement. 42 U.S.C. § 2000bb-1. A claimant must therefore establish more than sincere religious concern about government action; the governmental conduct must substantially burden actual religious exercise.

129. Plaintiffs accordingly do not rely merely upon the proposition that Big Bend is sacred or culturally important in a generalized sense. They allege that particular governmental acts will interfere with identified religious practices undertaken by identified persons at particular locations.

130. The distinction is important because federal courts have wrestled extensively with religious claims involving sacred federal lands. In *Lyng v. Northwest Indian Cemetery Protective*

*Association*, the Supreme Court held under the Free Exercise Clause that extremely serious effects upon Native religious practice resulting from federal use of federal land did not themselves amount to unconstitutional coercion. RFRA, enacted later, imposes a statutory substantial-burden inquiry on federal governmental action, but the precise relationship between RFRA and land-based Native religious exercise has remained heavily litigated.

131. Plaintiffs therefore allege, and will establish through declarations and other evidence, not simply that the challenged construction affects culturally important land, but that it will materially interfere with identified religious exercises of Hernandez and members of People of La Junta for Preservation.

## L. Construction Is Imminent and Will Cause Irreparable Harm

132. Defendants have moved beyond a general policy announcement. DHS has identified a specific project corridor, invoked § 102(c) to accelerate construction, and authorized activities including excavation, grading, road construction, staging, fill, lighting, cameras, sensors, and related infrastructure.

133. The Secretary expressly invoked waiver authority to ensure the expeditious construction of the project and described an acute and immediate need for additional barriers and roads. The challenged action therefore threatens near-term physical disturbance of the affected lands.

134. That disturbance will cause injuries that cannot be fully remedied after final judgment. Excavation may destroy archaeological context and cultural resources; roads, barriers, and lighting may permanently alter scenic, recreational, and religiously significant landscapes;

and construction may impair the business interests of Far Flung Outdoor Center before the legality of the project can be adjudicated.

135. Monetary relief cannot restore an archaeological site after it has been excavated, return a disturbed landscape to its prior condition, or recreate the religious and cultural use of a place after it has been permanently altered.

136. Plaintiffs therefore seek preliminary relief to preserve the status quo while the Court determines whether Defendants possess lawful authority to undertake the challenged construction. The requested relief would not prevent routine border-enforcement operations. It would prevent irreversible ground-disturbing construction until the legality of that construction can be decided.

## CAUSES OF ACTION

### COUNT I — Ultra Vires / Equitable Claim: DHS Lacks Authority to Undertake Development Contrary to 16 U.S.C. § 158.

137. Plaintiffs incorporate by reference and reallege each of the preceding paragraphs as though fully set forth herein.

138. Congress expressly provided that the "administration, protection, and development" of Big Bend National Park "shall be exercised under the direction of the Secretary of the Interior by the National Park Service." 16 U.S.C. § 158. Section 158 remains part of the federal statutory scheme governing Big Bend National Park.

139. Section 158 is not merely a procedural environmental requirement. It constitutes a specific congressional assignment of responsibility for the administration, protection, and

development of Big Bend National Park to the Secretary of the Interior acting through the National Park Service.

140. Defendants DHS, CBP, Mullin, Scott, Easterling, and persons acting under their direction propose to undertake extensive permanent development within Big Bend National Park, including excavation, grading, construction and improvement of roads, construction of physical barriers, installation of lighting, cameras and sensors, drainage improvements, staging areas, placement of fill, and related physical development.

141. DHS claims authority for those activities under § 102 of IIRIRA and has invoked § 102(c) to waive numerous legal requirements that would otherwise apply to the project.

142. In the June 9, 2026 waiver determination, however, the Secretary expressly identified and waived several statutes specifically governing Big Bend National Park, including 16 U.S.C. §§ 156, 157, 157c, and 157d. The Secretary did **not** identify or expressly waive 16 U.S.C. § 158.

143. Congress therefore continues to require that the administration, protection, and development of Big Bend National Park be exercised under the direction of the Secretary of the Interior through the National Park Service.

144. Section 102(c)'s waiver authority permits the Secretary to dispense with legal requirements that the Secretary determines must be waived to ensure expeditious construction of barriers and roads authorized by § 102. It does not independently transfer to DHS governmental authority that Congress specifically assigned to another department and agency.

145. Nor does a waiver of legal requirements itself constitute a conveyance of administrative jurisdiction over federal land, an interagency transfer of statutory responsibility,

or an independent grant of authority to develop lands that Congress placed under another agency's direction.

146. To the extent DHS and CBP undertake the challenged development independently of, contrary to, or in displacement of the authority Congress assigned to the Secretary of the Interior and the National Park Service under § 158, those actions exceed the authority conferred upon DHS and CBP by Congress.

147. Federal agencies and officers possess only the authority granted to them by Congress. Where federal officers act beyond the statutory limits of their authority, persons injured by those actions may seek prospective equitable relief restraining the ultra vires conduct.

148. Plaintiffs are presently threatened with concrete injury from Defendants' ultra vires actions, including economic injury, loss and alteration of recreational resources, destruction or impairment of archaeological and cultural resources, and interference with religious and traditional uses of affected lands.

149. Those injuries are imminent and irreparable because the challenged activities involve physical alteration of the land that cannot be completely restored after final judgment.

150. Plaintiffs are therefore entitled to declaratory and injunctive relief preventing DHS, CBP, their officers, contractors, agents, and persons acting in concert with them from undertaking the challenged development within Big Bend National Park unless and until such development is undertaken pursuant to lawful authority consistent with 16 U.S.C. § 158.

151. In the alternative, to the extent Interior, the National Park Service, Secretary Burgum has purported to transfer, relinquish, delegate, or permit DHS to exercise the authority Congress assigned to Interior and NPS under § 158, Plaintiffs allege that any such action is unlawful to the extent Congress has not authorized that transfer or displacement.

**COUNT II — Defendants Exceed the Construction Authority Conferred by § 102 of IIRIRA**

152. Plaintiffs incorporate by reference and reallege each of the preceding paragraphs as though fully set forth herein.

153. Section 102(a) of IIRIRA directs the Secretary to take such actions as may be necessary to install additional physical barriers and roads in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry.

154. Section 102(b) further authorizes specified border infrastructure, including fencing, barriers, roads, lighting, cameras, and sensors, in furtherance of operational control of the border.

155. Section 102(c) separately authorizes the Secretary, in the Secretary's discretion, to waive legal requirements determined necessary to ensure the expeditious construction of barriers and roads undertaken pursuant to § 102. The June 9 determination itself describes the waiver as one issued under that statutory framework.

156. The power to waive laws under § 102(c) is ancillary to the substantive construction authority Congress conferred in §§ 102(a) and (b). The waiver provision does not independently authorize projects falling outside the substantive scope of § 102.

157. DHS relied upon enforcement statistics for the Big Bend Sector as a whole to characterize the more narrowly defined project corridor as an area of high illegal entry.

158. The Big Bend Sector encompasses hundreds of miles of international boundary and a geographic area substantially larger than the particular corridor selected for the challenged construction.

159. The June 9 determination does not identify location-specific apprehension data demonstrating that each portion of the challenged construction corridor constitutes an "area of high illegal entry" within the meaning of § 102(a).

160. To the extent Defendants undertake construction at locations not satisfying the substantive conditions imposed by §§ 102(a) and (b), their actions exceed the statutory authority conferred by Congress.

161. Likewise, activities undertaken outside the geographic project area described in the applicable waiver, or activities insufficiently connected to barriers and roads authorized by § 102, are not transformed into authorized conduct by § 102(c).

162. Plaintiffs do not, through this Count, seek review merely of the Secretary's discretionary decision to waive particular legal requirements. Plaintiffs challenge the antecedent and independent question whether the challenged governmental conduct falls within the substantive construction authority Congress conferred in the first instance.

163. Plaintiffs are entitled to declaratory and prospective equitable relief restraining Defendants from undertaking construction beyond the authority conferred by § 102.

**COUNT III — Religious Freedom Restoration Act; 42 U.S.C. §§ 2000bb-1 and 2000bb-3**

164. Plaintiffs incorporate by reference and reallege each of the preceding paragraphs as though fully set forth herein.

165. RFRA provides that the federal government "shall not substantially burden a person's exercise of religion" even where the burden results from a rule of general applicability, unless the Government demonstrates that application of the burden to the particular person

furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1.

166. RFRA further expressly provides that federal statutory law enacted after RFRA is subject to RFRA unless the later statute explicitly excludes RFRA's application by reference to RFRA. 42 U.S.C. § 2000bb-3(b).

167. IIRIRA and the subsequent amendments expanding § 102 postdate RFRA.

168. Neither § 102 nor the Secretary's June 9, 2026 waiver determination expressly excludes RFRA by reference.

169. Congress has separately declared it to be the policy of the United States to protect and preserve for American Indians the inherent right to believe, express, and exercise traditional religions, including access to sites, use and possession of sacred objects, and freedom to worship through ceremonials and traditional rites. 42 U.S.C. § 1996. The Secretary's June 9, 2026 waiver determination does not identify the American Indian Religious Freedom Act among the legal requirements waived. The forms of religious exercise identified by Congress correspond directly to the practices alleged here, including access to particular religious sites, use of materials gathered from the Rio Grande landscape, and participation in traditional ceremonies and rites.

170. Plaintiff Christina Hernandez engages in sincere religious exercises connected to particular places, natural features, and cultural landscapes within the Big Bend and La Junta region, as alleged above.

171. Plaintiff Andrew Austin engages in sincere religious exercises connected to particular places, natural features, and cultural landscapes within the Big Bend and La Junta region, as alleged above.

172. Members of People of La Junta for Preservation likewise engage in protected religious exercises connected to places threatened by the challenged project.

173. Defendants' proposed excavation, construction of roads and barriers, physical alteration of sites, restrictions upon access, artificial lighting, and related activities will substantially burden those exercises.

174. The threatened burden is attributable to the federal government and constitutes governmental action within the meaning of RFRA.

175. Defendants therefore bear the burden of demonstrating that imposition of the challenged burden upon Hernandez and the affected religious practitioners furthers a compelling governmental interest and represents the least restrictive means of furthering that interest.

176. Even assuming border security constitutes a compelling governmental interest, Defendants must demonstrate why construction at the particular locations burdening Plaintiffs' religious exercise, in the particular manner proposed, is the least restrictive means available.

177. Reasonable alternatives—including alteration of routes, avoidance of particular locations, use of existing roads or technological surveillance, modification of lighting, adjustment of the construction footprint, or other site-specific accommodations—may permit Defendants to pursue legitimate border-security objectives without imposing the threatened burden.

178. Defendants have not demonstrated that the challenged construction constitutes the least restrictive means of furthering their asserted interest as applied to Hernandez and the other affected practitioners.

179. Plaintiffs are therefore entitled to appropriate declaratory and injunctive relief under RFRA.

**COUNT IV — Ultra Vires Occupation of Property without Lawful Acquisition Authority**

180. Plaintiffs incorporate by reference and reallege each of the preceding paragraphs as though fully set forth herein.

181. Section 102(c)'s waiver of legal requirements does not itself convey title, create an easement, transfer possession, or vest DHS with a property interest in land owned by another person or sovereign.

182. To the extent construction requires occupation of private, state, tribal, leased, or otherwise non-DHS property, Defendants must possess independent lawful authority and the necessary property interest to enter and develop that land.

183. Defendants may not transform the Secretary's waiver of regulatory requirements into an acquisition of property that Congress has not conveyed and the United States has not lawfully obtained.

184. Any physical entry, occupation, excavation, or construction upon property in which Defendants lack a lawful right of possession exceeds their statutory authority and is subject to prospective equitable relief.

**REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF**

185. Plaintiffs incorporate by reference and reallege each of the preceding paragraphs as though fully set forth herein.

186. An actual and substantial controversy exists between Plaintiffs and Defendants concerning Defendants' authority to undertake the challenged construction within Big Bend National Park and the surrounding project area.

187. Plaintiffs contend that Defendants' proposed construction exceeds statutory authority conferred by Congress, conflicts with unwaived federal law, burdens protected religious exercise, and otherwise violates the Constitution and laws of the United States as alleged herein.

188. Defendants have announced their intention to proceed expeditiously with construction involving excavation, grading, roads, barriers, lighting, surveillance infrastructure, and other physical disturbance.

189. Plaintiffs face immediate and irreparable injury if such construction proceeds before the legality of Defendants' actions can be adjudicated.

190. Plaintiffs lack an adequate remedy at law because monetary damages cannot restore archaeological context, cultural or religious sites, undisturbed landscapes, natural darkness, or other resources permanently altered or destroyed by construction.

191. Plaintiffs therefore seek temporary, preliminary, and permanent injunctive relief preserving the status quo and preventing Defendants from undertaking unlawful ground-disturbing construction pending determination of the merits.

192. Plaintiffs further seek declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 establishing the respective statutory rights and obligations of the parties.

**PRAYER**

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that 16 U.S.C. § 158 remains applicable and was not waived by the Secretary's June 9, 2026 determination;

B. Declare that Defendants may not undertake development within Big Bend National Park beyond the authority Congress conferred upon them or contrary to unwaived federal law;

C. Declare, to the extent established by the evidence, that the challenged construction exceeds the substantive authority conferred by § 102 of IIRIRA;

D. Declare that RFRA applies to the challenged federal action and prohibit Defendants from substantially burdening Plaintiffs' protected religious exercise except in accordance with RFRA;

E. Temporarily restrain and preliminarily and permanently enjoin Defendants, their officers, agents, employees, contractors, subcontractors, and persons acting in active concert or participation with them from clearing, excavating, grading, blasting, constructing or improving roads, constructing physical barriers, creating staging areas, placing fill, installing permanent lighting, cameras, sensors, or other infrastructure, or otherwise physically disturbing lands within Big Bend National Park except pursuant to lawful authority and in compliance with all applicable unwaived federal law;

F. Provide that such injunction shall not prohibit ordinary Border Patrol operations, patrols conducted on existing roads or facilities, emergency activities, or other lawful border-enforcement activities that do not involve the challenged construction or physical alteration of the affected lands;

G. Enjoin any physical occupation of property for which Defendants lack lawful title, easement, right of entry, or other sufficient property interest;

H. Award Plaintiffs their reasonable attorneys' fees and costs to the extent authorized by law, including under RFRA and any other applicable fee-shifting provision;

I. Waive or set nominal security under Rule 65(c) to the extent permitted by law; and

J. Grant Plaintiffs such other and further relief, at law or in equity, as the Court deems just and proper.

**DATE**: August 14, 2026

Respectfully submitted,

*/s/ Roland Gutierrez*
Roland Gutierrez
The Law Office of Roland Gutierrez
SBN #: 24007291
104 Babcock Ste. 107
San Antonio, Texas 78201
(210) 225-7114

Martin Golando
State Bar No. 24059153
The Law Office of
Martin Golando, PLLC
2326 W. Magnolia
San Antonio, Texas 78201
Martin.Golando@gmail.com
210.471.1185

Dick DeGuerin
DeGuerin and Dickson 1018 Preston
Houston, Texas, 77002
SBN #: 05638000
713-223-5959

ATTORNEYS FOR PLAINTIFFS